Mark Williams v. Adolphus Kimball.—Syllabus.

———

MARK WILLIAMS, FOR USE OF JOHN WALLACE, APPELLANT, VS. ADOLPHUS KIMBALL, APPELLEE.

1. Where slave marriages have terminated before or have never been recognized by the parties thereto after they became free persons, the offspring thereof have no inheritable blood. They cannot inherit property acquired by their ancestors after emancipation.

2. The descent and heirship of real estate are exclusively governed by the law of the country within which it is actually situate. No person can take by descent except those who are recognized as legitimate heirs by the laws of that country.

3. By the ancient law of England, which received legislative affirmation by the statute of Merton (20th year Henry III. A. D.

4

1235), only those were lawful heirs in the descent of real estate who were born after the actual marriage of their parents; and this is the law in this State, except where it has been modified by our statute.

4. Legitimation in a foreign country does not make lawful heirs to real estate in other countries where the common law or statute of Merton prevails, of those who were born out of lawful marriage.

5. So far as the law of descents is concerned, the *lex loci rei sitae* must prevail; and the different States of this Union are foreign countries to each other.

6. The progeny born of slave marriages which terminated before the emancipation of the parties thereto, while perhaps from a liberal point of view are not bastards, are yet, so far as want of inheritable blood is concerned, placed in the same catagory as bastards.

7. Our statute which provides as follows: "* * * Bastards, also, shall be capable of inheriting or of transmitting inheritance, on the part of their mother, in like manner as if they had been lawfully begotten of such mother," only makes the bastard legitimate so far as his mother is concerned. It does not make him legitimate so far as the kindred of his mother are concerned; and he can not take by inheritance from collateral kindred upon his mother's side.

Appeal from the Circuit Court for Duval county.

The facts in the case are stated in the opinion of the court.

*Cooper & Cooper*, for Appellant.

*M. C. Jordan* and *R. B. Archibald*, for Appellee.

LIDDON, J. :

Diana Landsbury (sometimes called in the record Diana Landsbury Kimball), a negro woman, who was born a slave, died in Duval county, Florida, on the 23rd day of November, 1885, seized in fee simple of a tract of land situated in said county. The case below

was an action of ejectment brought by the appellant against the appellee, who is in the possession of the property, claiming as the husband and heir-at-law of said Diana, who left no children surviving her. The judgment was for defendant.

The validity of the title of the defendant is attacked, upon the ground that he is not the lawful husband and heir of the deceased Diana. In actions of ejectment the plaintiff must recover upon the strength of his own title, and not upon the weakness of the title of his adversary. In view of the conclusion that we have reached, that the plaintiff has shown no right of recovery, it is unnecessary to pass upon the title of the defendant. The deceased had no living relatives except the appellant Williams. Williams claimed to be a brother of Polly Page, the mother of said Diana. Both the appellant and Polly Page were born slaves— of the same slave father and mother. Whether they were the children of a customary slave marriage, or some other cohabitation, does not appear from the record; but the said slave marriage or cohabitation, whichever it was, terminated before the emancipation of the parties thereto. The only question necessary to be considered is the inheritable capacity of the appellant, who (the land being held adversely) has made a quit-claim deed of the property to John Wallace, for whose use he brings suit. The question of the inheritable capacity of persons born of slave marriages is one upon which there has been considerable diversity of opinion. In this State it has been settled for years that the offering of such marriages, which have never been recognized by the parties thereto after they became free persons, and capable of making such contracts of marriage, have no inheritable blood, they can not inherit property acquired by their ancestors after

emancipation. Daniel vs. Sams, 17 Fla., 487. It is contended, however, that the plaintiff Williams is and has always been a resident of the State of Georgia; that by an act of that State he has been legitimated, and that this being legitimate in Georgia he has a status established by law which makes him legitimate in every other State and country. The effect of this contention would be that the capacity of a person to inherit real estate in this State would depend not upon our laws, but upon the varying statutes of perhaps a hundred or more different States or countries in which the claimants of the estate might reside. In such a state of the law, one a resident citizen of the State would be excluded as an heir, but would be entitled to share in the estate if he accidentally lived over the border line of an adjoining State. By the common law, which is law with us, all questions of the distribution and descent of real estate must be determined by the law of the jurisdiction in which the property is situated. Speaking upon this subject, Story on Conflict of Laws (sec. 483) says: "* * The descent and heirship of real estate are exclusively governed by the law of the country within which it is actually situate. No person can take, except those who are recognized as legitimate heirs by the laws of that country; and they take in the proportions and the order which those laws prescribe. This is the indisputable doctrine of the common law." Such is even the more prevalent view among the law-writers of those countries where the common law does not prevail. "Foreign jurists generally, although not universally, maintain the same doctrine; and accordingly hold that in cases of succession *ab intestato* we are to ascertain the persons who are to take the inheritance by the *lex loci rei sitae*, whether the question respects legitimacy or

primogeniture, or right of representation, or proximity of blood, or next of kin." *Ibid*, sec. 484, *a*. Among a great mass of authorities which sustain the propositions quoted from Story are: Boyce vs. City of St. Louis, 29 Barb., 650; Dawes vs. Boylston, 9 Mass., 337, S. C. 6 Am. Dec. 72; Bryan vs. Moore, 11 Martin (La.), 26, S. C. 13 Am. Dec. 347, and authorities cited in note; 3 Am. and Eng. Ency. of Law, 566; Abston vs. Abston, 15 La. Ann., 137; Potter vs. Titcomb, 22 Maine, 300; Elliott vs. Lord Minto, Mad. & Geld. 16; Chapman vs. Robertson, 6 Paige, 627; S. C. 31 Am. Dec. 264.

Being convinced that a Georgia statute not in harmony with our system, upon the capacity of persons to inherit real estate, could not prevail here, we have not attempted to interpret or construe the same. It cannot be denied that a number of decisions can be found upholding the proposition, that persons made legitimate by the laws of one State are legitimate everywhere. We have taken great pains to examine a number of these decisions. They mostly apply to residents of the States in which suits are brought, who, before their removal thereto, have been legitimated in other States. Some proceed upon statutory grounds, some expressly repudiate the common law and ancient English statutory doctrine. Before the Parliament of Merton, in the 20th year of Henry III., A. D. 1235, it had been the law of England with respect to the descent of land, that the son must be born after the actual marriage of his father and mother. This rule was framed for the express purpose of excluding in the descent of land in England the application of the rule of the civil and canon law, by which the subsequent marriage of the parents was held to make the son born before marriage legitimate. At the Parliament

of Merton the clergy proposed to change the law, so
that *antenati* legitimated by the marriage of their pa-
rents might inherit, but the barons refused to change
the law of the realm. Therefore the statute of Merton,
instead of being a new enactment upon the subject,
was a legislative declaration of an ancient law. It has
been declared to be in force in England by the British
House of Lords as late as 1839. (Birtwhistle vs. Var-
dill, 7 Clark & Fin., 895, S. C. 6 Bingham's N. C. 385).
It is now by adoption the law in this State (Sec. 7,
page 708, McClellan's Digest) and, with the statutory
exceptions hereinafter noted, those only possess herit-
able blood who are born in lawful wedlock, or in a
competent time after its termination. It has been held
that legitimation in a foreign country does not make
lawful heirs, in other countries where the common law
or the statute of Merton is now in force, of those who
were born out of lawful marriage. So far as the law
of descents is concerned, the *lex loci rei sitae* must
prevail, and the different States of this Union are
foreign countries to each other. In the case of Birt-
whistle vs. Vardill, *supra*, it was decided that a child
born in Scotland before the marriage of his parents,
but who was legitimated by their subsequent marriage
according to the laws of that country, could not in-
herit lands in England. In Lingen vs. Lingen, 45
Ala. 410, it was held that a bastard child conceived in
Alabama, but born in France, and legitimated by an
acknowledgment of the father in due form of law, ac-
cording the laws of that country, was not a lawful
heir to real estate in Alabama.

In Smith vs. Derr's administrators, 34 Penn St., 126,
S. C. 75 Am. Dec., 641, under the authority of Birt-
whistle vs. Vardill, 5 Barn. & Cress., 438, and same
case on appeal to the House of Lords, cited above, it

was held that a bastard child duly legitimated by a decree of a Circuit Court of Tennessee, according to the laws of that State, was not thereby rendered capable of inheriting land in Pennsylvania. Later decisions in Pennsylvania are to different effect, but they are placed upon the express ground that the statute of Merton has been abolished in that State since the decision in Smith vs. Derr's administrators.

.The status of negroes born of marriages terminating before the general emancipation of the slaves in the Southern States is a peculiar one. To some extent the right of marriage was recognized among them. It is a part of the history of the extinct institution of slavery in the Southern States, that these slave marriages were often had with the approbation of the owners of the slaves; that the marriage ceremonies were publicly celebrated, often by the ministers of the gospel, and were sanctioned by the churches of the country. The subsequent cohabitation of the parties was never regarded as illicit or immoral, but as perfectly right and proper; and it was regarded as a wicked thing for either party to be unfaithful to the marriage vow. The children born of such marriages were regarded as standing upon a different plane to those slave children who were bastards pure and simple. These views prevailed from regarding marriage as a divine institution, and not from looking upon it from the standpoint of the law which has concern with it only as a civil contract. The progeny of such marriages, while perhaps from a liberal point of view are not bastards, are yet so far as want of inheritable blood is concerned, placed in the same catagory as bastards. It is, therefore, we think, entirely right and proper to give the appellant the benefit of any statute changing the ancient statute of Merton, by adding to the inheritable capacity of

bastards. The appellant not claiming to have been legitimated by a subsequent marriage of his parents in accordance with the statute of 1828 (McClellan's Digest, sec. 5, page 127), the only changes in our law which affects his claim is the act of 1829, McClellan's Digest, sec. 8, p. 470, and is as follows: " * * Bastards, also, shall be capable of inheriting or of transmiting inheritance, on the part of their mother, in like manner as if they had been lawfully begotten of such mother." In the present case the estate never vested in the appellant's mother. She died, it appears, before the abolition of slavery. Neither did it vest in Polly Page, the mother of the intestate, and sister of appellant; she (Polly Page) died some years before the intestate.

The appellant claims to inherit by descent from his niece. The question presented is, does the act under consideration legitimate the appellant in all respects, so far as the kindred of his mother is concerned, and can he take by inheritance from collateral kindred upon his mother's side? We think not. The construction given generally by the courts to acts of this kind has been a strict one. In such cases it has been held that a bastard might inherit from his mother, or his mother from him; but there the inheritable blood became dammed up in his veins, and its current could flow no further; it did not extend to collateral kindred. The very language of the statute of this State has been construed by the Supreme Court of the United States in the case of Stevenson's Heirs vs. Sullivant, 5 Wheaton, 207, text 260. The court upon this subject says: "The 18th Section of the law of descents, under which this question arises, is as follows; '* * Bastards, also, shall be capable of inheriting or of transmitting inheritance, on the part of their mother,

in like manner as if they had been lawfully begotton of such mother.' In the construction of this section, it is never to be lost sight of, that the appellants are to be considered as bastards, liable to all the disabilities to which the common law subjects them, as such, except those from which the section itself exempts them. Though illegitimate, they may inherit and transmit inheritance, on the part of the mother, in like manner as if they had been lawfully begotton of the mother. What is the legal exposition of these expressions? We understand it to be, that they shall have a capacity to take real property by descent immediately or through their mother in the ascending line; and transmit the same to their line as descendents, in like manner as if they were legitimate. This is uniformly the meaning of the expressions, 'on the part of the mother or father,' when used in reference to the course of descent of real property, in the paternal or maternal line. As bastards, they were incapable of inheriting the estate of their mother, notwithstanding they were the innocent offspring of her incontinence, and were, therefore, in the view of the legislature, and consonant to the feelings of nature, justly entitled to be provided for out of such property as she might leave undisposed of at her death, or which would have vested in her, as heir to any of her ancestors, had she lived to take as such. The current of inheritable blood was stopped in its passage from and through the mother, so as to prevent the descent of the mother's property and of the property of her ancestors, either to her own illegitimate children or to their legitimate offspring. The object of the Legislature would seem to have been to remove this impediment to the transmission of inheritable blood from the bastard in the descending line, and to give him a capacity to inherit

in the ascending line, and through his mother. But although her bastard children are in these respects *quasi* legitimate, they are, nevertheless, in all others, bastards, and as such they have and can have neither father, brothers, or sisters. They can not, therefore, inherit from Richard Stevenson, because, in contemplation of law, he is not their brother; and even if he were their brother, they would not inherit their estate under this section, on the part of their mother, but directly from Richard, the descent from brother to brother being immediate. Upon no principle, therefore, can this section help the appellant's case. His estate never vested in the mother, so as for her bastard children to inherit from her; no did it pass through her in the course of descent to the bastard children." To same effect are Jackson vs. Jackson, 78 Ky. 390, S. C., 39 Am. Rep. 246; Curtis vs. Hewins. 11 Met. 294; Pratt vs. Atwood, 108 Mass. 40; Haraden vs. Larrabee, 113 Mass. 430. Considering the appellant as a bastard, he is not able by our statute to take the estate sued for.

The judgment of the court below is affirmed.