## COLE *v.* TAYLOR.*

### (*Jackson.*  April Term, 1915.)

1. **SLAVES. Legitimation. Direct and collateral inheritance.**
Under Acts 1865-66, ch. 40, secs. 1, 2, giving to all negroes and
their descendants having any African blood the right to inherit,
and section 5, limiting the right of inheritance by children of
former slaves to property acquired by their parents, the right
of inheritance does not extend beyond direct inheritance from
the parents, and does not include the right of collateral inher-
itance, and this declared policy of the State the courts, on the
ground of comity alone, will not vary, so as to allow a collat-
eral inheritance between children of a legitimized slave mar-
riage coming from other States which it does not allow to native
former slaves; so that a woman born in slavery under a slave
marriage, who, with her brother, was legitimized by the law of
another State, could not inherit from her deceased brother.
(*Post, p.* 95.)

Cases cited and approved:  Carver v. Maxwell, 110 Tenn., 75;
   Jones v. Jones, 234 U. S., 616;  Williams v. State, 67 Ga., 262;
   Tucker v. Bellamy, 98 N. C., 31;  Jones v. Hoggard, 108 N. C.,
   178;  Williams v. Kimball, 35 Fla., 49;  Sheperd v. Carlin, 99
   Tenn., 64.

Cases cited and distinguished:  Gregley v. Jackson, 38 Ark., 487;
   Miller v. Miller, 91 N. Y., 315.

2. **SLAVES. Legitimation. Status.** The status of legitimacy of
the children of slave marriages fixed by the laws of one juris-
diction follows the person, and should be sustained in every
State to which he may go, though the rule must yield to the
policy of the State of adoption so far as inheritance is con-
cerned.  (*Post, p.* 102.)

Acts cited and construed:  Acts 1865, ch. 40, secs. 1, 2, 5.

Cases cited and approved:  Finley v. Brown, 122 Tenn., 335;  Cope

---

*The authorities passing upon conflict of laws as to legitimacy are
reviewed in a note in 65 L. R. A., 177.

v. Cope, 137 U. S., 682; Levy v. McCartee, 6 Pet., 102; Blythe v. Hinckley, 180 U. S., 333.

Cases cited and distinguished:   Miller v. Miller, 91 N. Y., 315; Ross v. Ross, 129 Mass., 243; Dayton v. Adkisson, 45 N. J. Eq., 603; Williams v. Kimball, 35 Fla., 49; Ewing v. Sneed, 5 J. J. Marsh (Ky.), 459; Lingen v. Lingen, 45 Ala., 410; Harris v. Harris, 85 Ky., 49; Leonard v. Braswell, 99 Ky., 528; In re Waesch's Estate, 166 Pa., 204; Doe v. Vardill, 5 Bar. & Cr., 438; Jones v. Jones, 234 U. S., 618.

3. **DESCENT AND DISTRIBUTION. "Inheritance." What law governs. "Natural right."**

The State possesses the power to prescribe the laws under which property within the State may descend, and may preclude any other mode or law of descent, and, being the sovereign of the soil, the policy of its laws as to the descent of real property is paramount to that of the legal *status* of persons coming from foreign countries in case of a conflict of laws; "inheritance" not being a "natural or absolute right," but purely a creature of statutory law governed by the *lex rei si.ae.*   (*Post, p.* 102.)

4. **SLAVES. Persons born in slavery. Status. "Bastard."**

A person born of parents while in a state of slavery is regarded as a bastard, as the state of bondage precluded the husband and wife yielding to each other the duty, fealty, and protection that the law requires, and because of incapacity to contract; it following necessarily there was no lawful issue, as there was no lawful marriage in such cases.   (*Post, p.* 109.)

---

FROM SHELBY.

---

Appeal from the Chancery Court of Shelby County. —F. H. HEISKELL, Judge.

BYARS & CAPELL, for appellant.

RANDOLPH & RANDOLPH and B. F. BOOTH, for appellee.

MR. JUSTICE FANCHER delivered the opinion of the Court.

Tom Pollard died intestate while a resident and citizen of Memphis, Shelby county, Tenn., March, 1910, the owner in fee simple of the west one-half of lot 29 of F. W. Smith's subdivision, on the south side of St. Paul avenue, in said city of Memphis, being property conveyed to him by deed of George W. King of date January 17, 1876.

Tom Pollard left surviving him his widow, Emma Pollard, who died about September 3, 1911. He left no issue.

This is a suit by Alice Cole to recover of defendant, Sir Charles Henry Taylor, the said lot of land.

The defendant claims title under a will of Emma Pollard. The complainant claims title as a sister of Tom Pollard.

It appears that Tom Pollard and Alice Cole were children of Jordan Pollard and wife, Frances Pollard, all of whom were persons of color, and were slaves prior to the emancipation. Jordan and Frances Pollard were married in accordance with the custom of slave marriages, in the State of Georgia many years before the Civil War. They lived together as husband and wife till the death of Jordan, about ten years ago, and Frances has since died.

Alice Cole is the sole survivor of this family; all her brothers and sisters having died without issue.

During the Civil War the family removed from Georgia to Alabama, from whence they returned after

Cole v. Taylor.

the close of the War to Georgia, but these dates are not
fixed. Jordan and Frances and some of their children
were moved to Mississippi about 1868.

Soon after the war either by constitutional or stat-
utory enactment provisions were made by the States
of Georgia, Alabama, Mississippi, Tennessee, and other
Southern States establishing the *status* of negroes un-
der slave marriages.

It is the insistence of the plaintiff that by the laws
either of Georgia, Alabama, or Mississippi the slave
marriage of Jordan Pollard and Frances Pollard was
made valid, and their children legitimated to all intents
and purposes; that, said Tom and Alice being legiti-
mate under the laws of one or the other of these States,
they are legitimate here, and, being so, the said Alice
may inherit from her brother, Tom. The chancellor
rendered a decree in accordance with this position, and
permitted a recovery by the complainant, from which
decree the defendant appealed to this court.

The statute of Tennessee on this subject has been be-
fore the court a number of times. This act declared
that slaves who within the State had lived together
as man and wife should be regarded as lawfully mar-
ried, and that the children of such slave marriages
should be legitimately entitled to an inheritance in any
property heretofore acquired or that may be hereafter
acquired by such parents to as full an extent as the
children of white citizens are entitled by the laws of
this State. This statute was properly construed as
not extending any right of inheritance beyond the lin-

eal descendants of parents.    *Sheperd* v. *Carlin,* 99
Tenn., 64, 41 S. W., 340; *Carver* v. *Maxwell,* 110 Tenn.,
75, 71 S. W., 752; *Jones* v. *Jones,* 234 U. S., 616, 34
Sup. Ct., 937, 58 L. Ed., 1502.

The statute of Georgia upon the same subject was
approved March 9, 1866 (Acts 1865-66, p. 240), and is
as follows:

"The general assembly of the State of Georgia do
enact, that persons of color, now living together as hus-
band and wife, are hereby declared to sustain that legal
relation to each other, unless a man shall have two or
more reputed wives, or a woman two or more reputed
husbands. In such event, the man, immediately after
the passage of this act by the general assembly, shall
select one of his reputed wives, with her consent; or
the woman one of her reputed husbands, with his con-
sent; and the ceremony of marriage between these two
shall be performed."

Code of Georgia, 1911, section 2180, provides as fol-
lows:

"Every colored child born before the 9th day of
March, 1866, is hereby declared to be the legitimate
child of his mother; but such child is the legitimate
child of his colored father only when born within what
was regarded as a State of wedlock, or when the par-
ents were living together as husband and wife."

The supreme court of Georgia, in the case of *Wil-
liams* v. *State,* 67 Ga., 262, held that the object of the
act of March 9, 1866, was to declare all people who had
been slaves, and were then living as man and wife,

really and to all intents and purposes as fully husband and wife as though they had been formerly married, and that, if they continued to live on the 9th day of March, 1866, being then free, such living together by them at that time should amount to the contract of marriage in the eye of the law, and thus it was made just as effectually the contract of marriage by them as if they had been always free and had been actually married.

A statute of Alabama passed on November 30, 1867, provided as follows:

"Section 1. Be it ordained by the people of the State of Alabama in convention assembled, That all such freedmen and women who shall now be living together as man and wife, shall be regarded in law as man and wife, and that the children of such connection, whether they be black or of mixed color, shall be and are hereby declared to be entitled to all the rights, benefits and immunities of children of any other class under the laws of Alabama."

Code of Alabama 1907, section 3766, provides as follows:

"Slaves and free persons of color prior to the abolition of slavery in this State, and their descendants, are capable of inheriting or transmitting property, real, personal, or mixed, the same in all respects as white persons, where the ancestors lived together as man and wife under such circumstances as would constitute a valid marriage at common law. This section

132Tenn.7

shall also apply to and govern all cases heretofore aris-
ing and to which it may be applicable.''

. The constitution of Mississippi (section 22, art. 12),
adopted in 1869, provides as follows:

''All persons who have not been married, but are now
living together, cohabiting as husband and wife, shall
be taken and held, for all purposes in law, as married,
and their children, whether born before or after the
ratification of this constitution, shall be legitimate; and
the legislature may, by law, punish adultery and concu-
binity.''.

The learned chancellor was of opinion that Tom and
Alice Pollard (now Cole) were born in the State of
Georgia prior to March 9, 1866, and had become and
were at said time legitimate children of the said Jor-
don and Frances Pollard, and that therefore Alice
could and did rightfully inherit as the only heir at law
of Tom Pollard the lot or parcel of land, subject to
the rights of the widow of Tom Pollard to homestead
and dower. The position is that, being legitimate chil-
dren, they have a right of collateral inheritance accord-
ing to the Tennessee laws of descent. Our Tennessee
law upon the subject, now firmly established by judi-
cial construction, limits its own citizens occupying this
same relationship born in slavery under slave marriage
to direct inheritance from the parents. It was said in
the case of *Sheperd* v. *Carlin,* supra:

''We are of opinion that, by the plain terms of this
act, the right and power of inheritance is conferred
only as to such property as may descend from parents,

Cole v. Taylor.

and that no right of collateral inheritance is conferred by the act. This was no doubt the intention of the general assembly, and is the clear meaning of the words of the act, which can admit of no other construction. A like construction has been placed upon statutes similar to the Acts of 1865-66 in other States. *Tucker* v. *Bellamy,* 98 N. C., 31, 4 S. E., 34; *Jones* v. *Hoggard,* 108 N. C., 178, 12 S. E., 906, 907; *Williams* v. *Kimball,* 35 Fla., 49, 16 South., 783, 786, 26 L. R. A., 746, 48 Am. St. Rep., 238.''

The court is asked in this case, on grounds of comity between the States, to adopt the laws of either Georgia, Alabama, or Mississippi, and to grant to ex-slaves coming from one or the other of these states a right of collateral inheritance which the legislature of our own State has refused to persons born of slave marriages in the State of Tennessee. The case of *Gregley* v. *Jackson,* 38 Ark., 487, is cited by the complainants' counsel. Slave parents and two children had lived in South Carolina. The husband died during slavery in that State. The mother and children were brought to Arkansas, and the mother died in that State in 1864. One of the children died in Arkansas in 1878, and the court held that his slave brother inherited his property. It was held that the Arkansas act legitimating the offspring of negroes cohabiting as husband and wife legitimatized the said children, notwithstanding the parents were married and the children born in South Carolina. That case does not involve a question of

conflict of laws nor any difference regarding the policy of the law as to inheritance by ex-slaves.

It is insisted that *Miller* v. *Miller,* 91 N. Y., 315, 43 Am. Rep., 669, is a case affording authority for the position of complainant. In that case the complainant was born in the kingdom of Wurtemburg, before the marriage of his parents, who afterward moved to the State of Pennsylvania, where the father became a citizen of the United States, and while domiciled there his parents were lawfully married, afterward moving to New York. The plaintiff's father owned real estate after he moved to New York and at the time of his death. The law of Pennsylvania provided that:

"In any and every case where the father and mother of an illegitimate child or children shall enter into the bonds of holy wedlock and cohabit, such child or children shall thereby become legitimated and enjoy all the rights and privileges as if they were born during wedlock of their parents."

There was also a statute found in the laws of Wurtemburg of 1610 which provided:

"That whatever is declared in the foregoing title regarding the inheritance of children born in lawful wedlock shall be applicable also to such children as are begotten of two persons unmarried (but not too closely related for their betrothal or lawful conjugal cohabitation) and who first become legitimate by the subsequent marriage of their parents, shall be held equal to those children who are born in lawful wedlock as regards the rights of inheritance from its parents,

brothers and sisters and their relatives as in all other respects."

It was held that these acts legitimated the son, and conferred on him the right of inheritance of his father's property situated in New York. It was argued that, if the father had died in the State of Pennsylvania seized of real estate, no doubt would arise as to the claim, and the question was asked: Would he lose this right if the father moved out of the State of Pennsylvania and located in the State of New York? The court propounded the following query:

"Could he be legitimate in one State and illegitimate in another?"

Answering the question, the court said:

"Such a rule would render the right of inheritance sanctioned by the law of the State where he resided one of great uncertainty, and conflictive, and in many cases it would operate so as to produce great injustice."

The court in that case quoted from Story on Conflicts of Law, section 93:

"That foreign jurists generally maintain that the question of legitimacy or illegitimacy is to be decided exclusively by the law of the domicile of origin."

And further in the same section:

"It seems admitted by foreign jurists that, as the validity of the marriage must depend upon the law of the country where it is celebrated, the *status* or condition of their offspring as to legitimacy or illegitimacy ought to depend on the same law, so that if by the law

of the place of the marriage the offspring, although born before marriage, would be legitimate, they ought to be deemed legitimate in every other country for all purposes whatever, including heirship of immovable property.''

Wheaton, in his Law of Nations, p. 172, was also quoted in that opinion, as follows:

''Legitimacy or illegitimacy are among universal personal qualifications, and the laws of the State featuring all of these personal qualities of its subjects travel with them wherever they go, and attach to them in whatever country they may be resident. The general current of authority favors the doctrine that, where an illegitimate child has been legitimated by a subsequent marriage of its parents according to the laws of the State or country where the marriage takes place and the parents are domiciled, such legitimacy follows the child wherever it may go.''

Other authorities along the same line are cited by the complainant, and as a general proposition it should be admitted that in all cases this personal relation of the parties should be sustained, and, where by the laws of any civilized country a child is regarded as legitimate, that relationship should be sustained in any and all countries wherever he may travel. There is, however, another doctrine of the law, which is equally well settled, and which in some instances may qualify the rights flowing from this legal *status* of persons. That principle is that, as to the right of inheritance of property within a State, such State possesses the power and

authority to prescribe laws under which that prop-
erty may descend, and may preclude any other mode or
law of descent. The State is the sovereign of the soil,
and the policy of its laws in regard to the descent of
real property should be considered paramount to that
of the legal *status* of persons coming from foreign
countries in case of a conflict of laws.

In the case of *Miller* v. *Miller,* supra, no provision
of the New York law of descent was found to be in-
consistent in policy with the right of this German citi-
zen to inherit from his father.

A peculiar situation was presented in the slavehold-
ing States of the Union just after the emancipation of
slaves. Marriage among these slaves was dependent
upon the consent of the master, and he could divorce
them at will. Slaves were incapable of contracting, and
therefore incapable of entering into the relationship
of marriage. They could not own property except with
the consent of their master and were incapable of in-
heriting property from each other. The emancipation
of slaves and their rights growing out of the fourteenth
amendment to the constitution of the federal govern-
ment presented a sudden and radical change in the re-
lationship of these people. In many instances they
were very ignorant. It seems apparent from our own
statute upon the subject that it was deemed unwise to
recognize or grant unqualified inheritance among the
negroes who had been slaves. The relationship was
often exceedingly doubtful, and the policy of our State
was to limit the descent of property among such per-

sons, only permitting it to descend from parent to child.

Under sections 1 and 2, ch. 40, Acts of 1865-66, all negroes, mulattoes, Mestizoes, and their descendants having any African blood in their veins were declared to have the right to make and enforce contracts, to sue and to be sued, to be parties and give evidence, to inherit, and to have full and equal benefits of all laws, etc.

Section 5 of that act contains the provision of our law which limits the right of inheritance by children of former slaves to property acquired by their parents. This provision contains no limitation of the personal relationship, and it does not contradict any provision of law legitimating such children. The first and second sections of the act are not mentioned in the opinions of this court, and these sections were not carried into the compilation of our laws. It is now argued that they confer the unlimited right of inheritance. We think not. These provisions are declaratory of the general *status* of negroes, and do not enlarge the limited right of inheritance of former slaves, as clearly expressed in the fifth section of the act. The Georgia statute also contains provisions identical with the first and second sections of our act. It may be considered that under the laws of Georgia or Alabama, as the case may be, Tom and Alice Pollard were the legitimate children of Jordan and Frances Pollard. Nevertheless, while legitimate, if they had been born and had always lived in Tennessee, there could be no inheritance be-

tween the brother and sister. Our State has seen proper not to allow this inheritance for reasons regarded by it sufficient. Thus the policy of our law is made manifest. Will the courts out of comity alone permit an inheritance by persons in this peculiar relationship, coming from other States, that it will not grant to former slaves, natives of this State? The law applicable to this peculiar condition is well stated by Rodgers on Domestic Relations. This author says:

"The general rule is the laws of inheritance will be controlled by the local laws of the State or country where the property to be inherited is situated, while the laws fixing the *status* of the person inheriting will be controlled by the laws of the State of the domicile of such person. That is, a person who is legitimate by the laws of the State of domicile is not necessarily legitimate by the laws of the State where the property he is to inherit is located. And if he is not legitimate by the laws of the place where the property is, he cannot inherit, though he be legitimate, by the laws of his domicile, and might inherit the same property if it were located in such places of domicile." Rodgers on Domestic Relations, section 596.

This author holds that the laws of one State conferring or denying legitimacy have no extraterritorial force, and that one State is in no sense bound to recognize the laws of another State upon the subject. The author recognizes that his position is stoutly denied in *Miller* v. *Miller,* 91 N. Y., 315, 43 Am. Rep., 669, in *Ross* v. *Ross,* 129 Mass., 243, 37 Am. Rep., 321, and in

*Dayton* v. *Adkisson*, 45 N. J. Eq., 603, 17 Atl., 964, 4 L. R. A., 488, 14 Am. St. Rep., 763, all of which are cited by complainant in this case. He cites the following authority for his position: Story on Conflict of Laws, section 483; *Williams* v. *Kimball*, 35 Fla., 49, 16 South., 783, 26 L. R. A., 746, 48 Am. St. Rep., 238; *Ewing* v. *Sneed*, 5 J. J. Marsh. (Ky.), 459; *Lingen* v. *Lingen*, 45 Ala., 410; *Harris* v. *Harris*, 85 Ky., 49, 2 S. W., 549; *Leonard* v. *Braswell*, 99 Ky., 528, 36 S. W., 684, 36 L. R. A., 707; *In re Waesch's Estate*, 166 Pa., 204, 30 Atl., 1124; *Doe* v. *Vardill*, 5 Bar. & Cr., 438.

Mr. Rodgers recognizes that the doctrine laid down in *Miller* v. *Miller, Ross* v. *Ross,* and *Dayton* v. *Adkisson,* supra, is the general rule, and may perhaps, on principle at least, be regarded as the universal rule where the public policy of the State is not invaded by such laws conferring legitimacy. But, where there is a conflict of policy in this regard, the State's right in this respect is maintained by him for the following reasons:

"As to the right of inheritance of property within a State, such State certainly possesses the power and authority to prescribe laws by and under which that property may descend, and may preclude any other mode or law of descent. When this is done, the bastard who has been legitimated in a foreign country or State, but who is still a bastard, and precluded, by reason of such fact, from inheriting property within the State where the same may be situated, it would seem to be proper to hold that such bastard cannot inherit

Cole v. Taylor.

property in the State of the *locus* of the property. If he could do so, it would be tantamount to permitting a foreign State or country to dominate, in a sense, the policy of a State with respect to the right of inheritance of property within the jurisdiction exclusively of the courts of such State, and impose on such courts the duty of bowing in obedience to the laws of a foreign country, enacted in positive and hopeless conflict with the laws of the place of the property. Property within a State is under the dominion and control of the laws of such State. No laws of a foreign State can have the extraterritorial force claimed by the rulings which confer upon a bastard the right to inherit property in a State in which he is not recognized by law as a legitimate person capable of inheriting. The policy of a State in this respect may be based on the idea that it is best for all the citizens of the State that bastards, as defined by law, shall have no rights within such State not conferred by the laws of that State. If such be true, it would certainly seem reasonable to conclude that no other State would have the right to dominate a different course or public policy. A foreign State could no more do this than it could say that property situated in another State shall not be taxable in such State because the owner may live in a different State. Were this the case, one State could seriously interfere with the revenue, and incidentally the machinery, of the State government of another, a thing which no State would, for an instant, tolerate. The property is subject to taxation in the State of its location. It is, upon

analogy and reason, likewise subject to the laws of descent of such State. That the authorities are far from harmonious on this point must be conceded, and that there is forcible argument to the contrary is also frankly admitted. But it seems that the better reason sustains this contention.'' Rodgers on Domestic Relations, section 597.

Mr. W. C. Rodgers, the author of this work, is a lawyer of Nashville, Arkansas, and has well stated the question, in view of social conditions and laws affecting Tennessee.

When these negroes came to Tennessee they had been declared legitimate, and they came with the *status* of legitimate children under the laws of Georgia, Alabama, or Mississippi, but this relationship must yield to the policy of our own law in its control of the descent of property situated within its borders.

Tennessee has seen proper not to grant the right of collateral inheritance to such people, had their parents lived together as husband and wife in this State. It cannot be expected that the courts out of mere comity shall grant to citizens coming from other States a right which this State does not grant its own citizens. Inheritance is governed by the *lex rei sitae.* This is not a natural or absolute right, and purely a creature of statutory law.

The opinion of this court in *Finley* v. *Brown,* 122 Tenn. (14 Cates), 335, 125 S. W., 259, 25 L. R. A. (N. S.), 1285 (Chief Justice Neil), recognizes the authority of cases holding in favor of recognition by one State

of legitimation by subsequent marriage of parents by virtue of the laws of the State or country where the marriage took place, as against opinions holding the contrary. But that case was not one where the recognition of the laws of another State or country conflicted in policy with that of our Tennessee laws on the subject./ In that opinion it was recognized that this State will not by comity adopt the laws of another State opposed to our own institutions or policy.

Mr. Justice Lurton, in *Jones* v. *Jones,* 234 U. S., 618, 34 Sup. Ct., 938, 58 L. Ed., 1500, says:

"If one claim the right to succeed to the real property of another as heir, and his right is denied because he must trace his pedigree or title to or through an alien, a bastard, or a slave, the question is one to be determined by the local law. *Cope* v. *Cope,* 137 U. S., 682, 11 Sup. Ct., 222, 34 L. Ed., 832; *Levy* v. *McCartee,* 6 Pet., 102, 8 L. Ed., 334; *Blythe* v. *Hinckley,* 180 U. S., 333, 21 Sup. Ct., 390, 45 L. Ed., 557."

Persons born of parents while in a state of slavery are regarded as bastards, as the state of bondage precluded the husband and wife yielding to each other the duty, fealty, and protection that the law requires, and because of incapacity to contract. There being no lawful marriage in such cases, it followed necessarily there was no lawful issue. Rodgers on Domestic Relations, section 598.

It therefore follows that while, as a general proposition, legitimacy attaching in one jurisdiction follows the person wherever he may go, yet this rule is qualified to

the extent that it must yield to the policy of the State of his adoption, so far as the right of inheritance is concerned. The unquestioned right of a State to prescribe the manner in which real estate within its boundary may descend must not be lost sight of.

This right should be guarded, and in a doubtful case of conflict of laws should be resolved in favor of the State where the property is located. Tom and Alice Pollard were born as slaves, and therefore were not legitimate children. Their subsequent legitimation, wherever it may have occurred, must yield to the statute of Tennessee limiting the right of such persons to inherit only from the parent. To hold otherwise would discriminate in favor of nonresidents coming to this State as against the policy of our own law, and to confer a right upon them not common to natives of the State. It might open the door for grave dangers on other phases of the law, as against the social organization and wise and sound public policy of our own State.

The decree of the chancellor is reversed, and the cause will be remanded, to the end that the premises in controversy be restored to the possession of the defendant, the same now being held by a receiver, and all accrued rents will likewise be paid to him.