FLORIAN REUBEN CRAWFORD, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Dfendant in Error.*

Opinion filed Nov. 17, 1915.

1. In the trial of an indictment for murder where the State in rebuttal offers evidence of an immaterial circumstance, which is objected to by the defendant, and such circumstance neither contradicts, qualifies, limits nor explains any matter brought out by the defendant, but its admission by the court is calculated to impart to it an importance and significance which it should not have, to the defendant's injury, the admission of such evidence is reversible error.

2. Section 3989 General Statutes of 1906 providing for a view of the premises by the jury is not obligatory upon the court, who may order the view to be taken by the jury as in the court's discretion the necessity of the trial requires.

3. An involuntary confession of the defendant is inadmissible as evidence against him, even though he takes the stand as a witness in his own behalf and the involuntary confession is

sought to be used for the purpose of impeaching him as a witness.

4. Testimony which is admitted without objection although irrelevant and immaterial at the time it is, offered and would be excluded upon proper objection being made, may when all the testimony in the case is in, become relevant as an explanation of other testimony, or as rebuttal evidence, in which case a motion to strike it on the ground of irrelevancy should be denied.

5. A verdict signed by a juror as foreman with the initials of his Christian name and his surname in full instead of an abbreviation of his first name and surname in full as it appears in the panel, does not vitiate the verdict.

6. Where one assignment of error attacks the entire general charge of the court, the assignment will not be considered by the appellate court except to ascertain if any one of the instructions given was properly given, and if the appellate court finds one of such instructions to have been without error the assignment will not be sustained.

7. The same rule applies where several instructions have been requested and refused and one assignment of error attacks *en masse* the court's refusal to give such instructions. The appellate court will not consider such assignment of error except to ascertain whether one of such instructions was properly refused, and so finding, will not sustain the assignment.

Writ of Error to Circuit Court, Dade County; Geo. Couper Gibbs, Judge.

Judgment reversed.

*G. A. Worley & Son* and *A. Z. Adkins*, for Plaintiff in Error;

*T. F. West,* Attorney General, and *C. O. Andrews,* Assistant, for the State.

ELLIS, J.—The plaintiff in error hereafter referred to as the defendant, was convicted in the Circuit Court for Dade County of the murder of Joseph C. Keene and was sentenced to punishment by death. The case is here upon writ of error. The crime was alleged to have been committed in Dade County, Florida, on the 19th day of March, 1914, the indictment was filed May 15th of that year, and the defendant was put upon trial on the 25th day of that month.

There was evidence tending to show that the defendant and the deceased had been friends for many years, they moved from another part of the State to Dade County, owned farms adjoining each other, at one time with their families lived together in the same house and were members of the same church, although shortly prior to the difficulty the church had been divided into two factions, the deceased going with one faction and the defendant going with the other. Sometime before the difficulty in which Keene was killed, the precise time is not shown, the defendant removed himself and family to another house in the neighborhood, but the families of the defendant and deceased continued their friendly relations, frequently visiting at each others homes. On the morning of the 19th of March, 1914, the deceased in company with his son, a lad of about thirteen years, went to his field and on the way stopped at the defendant's house and called to him to "come on, let's go," or was called to by the defendant and invited to "come in," the witnesses do not agree on this incident. The defendant did not go with the deceased, nor did the deceased go into the de-

fendant's house, but went on with his son  to the field.
The defendant, who had been taking medicine the day be-
fore, and according to his statement was  not well, re-
mained at his house for awhile until his little girl left for
school, then mounting his bicycle started for Fulford, a
small town near by; passing near the residence of the
deceased, he turned and going as far as the rock road
left his bicycle there and went to the house, the daughter
of the deceased, Martha, a girl about fifteen years old,
was alone at the house; the defendant asked her for some
epsom salts.  She showed him where it was and he went
into the house and was in the act of drinking it, after
having put it in a cup with water, when the deceased ap-
peared with a drawn pistol, and in an angry and threat-
ening manner and violent words ordered the defendant
off the premises.  The pistol was, according to descrip-
tions of it, a very formidable weapon, an Automatic Colt's
of 32 or 38 calibre.  The defendant left the house under
the threat  of the deceased, conveyed in  the following
words, in reply to a question from the defendant asking
what the latter had done:  "You know what you are try-
ing to do, you know what you are trying.  Now this is
twice, the third time beware.  The first time you crook
your finger at me or fail to smile when you meet me, I
will make you rue the day you ever had a cap put on your
head.  Prepare yourself."  The defendant went to Ful-
ford and purchased some articles of merchandise, among
which were several gun shells carrying B. B. shot; re-
turning to his house he loaded his gun with one of the
shells, got some watermelon seed, his rake, and, taking
his gun, started for his field which was adjoining that of
the deceased, and separated from it by a furrow.  On the
way to the field he fired the gun once or twice, replacing

the empty shells with loaded ones; he met Dan High-
smith, a brother-in-law, and asked him to come on and
help plant watermelons.   Highsmith went with the de-
fendant to the latter's field.   In the adjoining field was
Keene and his son, attending to tomato plants near the
dividing line of the two fields, between 30 and 60 yards
away.   The testimony is very conflicting on this point.
It is true, however, that Keene had removed his coat in
which he had carried with him to the field the pistol he
had an hour or two before drawn upon the defendant.
Seeing the defendant in the adjoining field, Keene went
to his coat, picked it up, removed his pistol taking it in his
right hand, straightened his body to an erect position,
when the defendant fired his gun at Keene, inflicting
wounds which  produced the latter's  death  almost in-
stantly.

    The first assignment of error is based upon the action
of the court in overruling the defendant's objection to a
question propounded by the State Attorney to the wit-
ness R. E. McDonald on rebuttal.   The   question was:
"Were there any gun wads between the turn  row and
these foot prints where the young Keene boy said that
Crawford was standing?"   McDonald replied  that he
found none although he examined the ground.   The turn
row was the line dividing the field of the defendant from
that of the deceased.   The State had undertaken to show
that the defendant, after entering his field, crossed over
into the field of the deceased  and fired the shot  that
killed Keene.   McDonald had testified, when first intro-
duced by the State, that he saw tracks on Keene's side
of the line, and to the finding of a gun wad a few feet
from those tracks.   The defendant had undertaken to
show that the gun was fired by him while on his side of

the line, and that after firing the shot he crossed the line and walked a few feet toward the deceased to render him what assistance he could, when Highsmith called him back and advised him not to go, as Keene might shoot him. This was doubtless offered to explain the tracks made by Crawford in Keene's field. McDonald was called to show in rebuttal that the wads from the gun were not found between the turn row, the dividing line, and the point where Crawford stood when he fired the gun according to the testimony of Keene's son. There was nothing to show that under the conditions existing when the gun was fired, a gun wad, ejected from the gun fired by the defendant in his field at the point where he said he was standing when he fired, could not have fallen between the body of the deceased and the point in the latter's field, where Keene's son said the defendant stood when he fired the shot. The circumstance of McDonald finding no gun wad between the point in Keene's field, where the State's witness, Jerry Keene, said the defendant stood when he fired the shot, and the line between the two fields, could not therefore be the basis of an inference that the defendant went into Keene's field to fire the shot, and not afterwards, as he claimed.

That the defendant went into Keene's field to fire the shot was a very material question, bearing greatly upon the defense of justification, but between this fact and the finding of no gun wad by McDonald between the line dividing the fields and the point in Keene's field, where it was claimed the defendant stood and fired the shot, there is no relativeness, there being nothing to show that the conditions under which the gun was fired rendered it probable that the gun wads would fall to the ground within a certin distance from the point where the gun was fired.

The question to McDonald therefore sought information which was not in rebuttal of the defendant's evidence. The relevancy of evidence is determined, says Mr. Greenleaf, not by law, but by logic. While it is true that the jury are the judges of the weight of the evidence, it is not at all improbable that an immaterial circumstance, one tending to throw no light upon the inquiry, may, by receiving the approval of the court as proper evidence, be given an importance and significance which it should not have, to the injury of the defendant. McDonald's reply to the question in rebuttal tended neither to contradict, qualify, limit nor explain any matter brought out in the testimony produced by the defendant, yet it was admitted for the purpose of showing that the defendant went into Keene's field to shoot him, and to contradict the defendant's evidence that those tracks were made after the shooting. This testimony, receiving the approval of the court over the defendant's objection, was injurious and prejudicial to him.

The case of Starke v. State, 49 Fla. 41, 37 South. Rep. 850, referred to in the Attorney General's brief is not in point, for in that case the defendant sought to show that his manner and conduct and speech was the result of insanity; the State in rebuttal introduced testimony to show that his peculiar conduct and speech was due to the influence of intoxicating liquor, of which he had partaken; the court held the evidence to be admissible.

The second assignment also relates to the admission in evidence over defendant's objection, of testimony introduced in rebuttal. This assignment should fail because the evidence sought was contradictory of the statements made by the defendant as to his opinion of the pistol owned by Keene as an accurate and powerful weap-

on.   The contention of the defendant that at the distance
he was standing from the deceased, the   defendant be-
lieved he was in imminent danger of death or great bod-
ily harm from the use of the pistol by the deceased, was
at least qualified, if not materially weakened by his state-
ment that he would have no fear of injury from the pis-
tol at a distance of twenty steps.

The defendant asked for a view of the   premises,
which was denied by the court, and the ruling is assigned
as the third error.   There is nothing in the record to show
that a refusal to grant the motion of the defendant was in
anywise injurious to him, nor that a view of the prem-
ises was essential to a better understanding by the jury
of the evidence submitted.   The statute is not obligatory
upon the court, leaving it to be ordered as in his discre-
tion the necessity of the trial requires.   General Statutes
§3989; Galena & S. W. R. Co. v. Haslam, 73 Ill. 494;
Springer v. City of Chicago, 135 Ill. 552, 26 N. E. Rep.
514, 12 L. R. A. 609; Tully v. State, 69 Fla. 662, 68
South. Rep. 934.   See   also   note in 42 L. R. A. 368;
Thompson v. State, 52 Fla. 113, 41 South. Rep. 899.

The fourth and fifth assignments of error are well
taken.   For the purpose of impeaching the testimony of
the defendant who was sworn as a witness at the trial,
the State asked him if he did not testify before the
Coroner at the inquest, he replied that he did.   The
defendant's testimony at the inquest was then read to him
and he was asked if he did not so testify; he replied:
"I did not say that; see if you see my name   signed to
that."   The State Attorney said:   "There is no name."
The defendant then said: "I refused to sign it from
the simple fact that it was not what I said."   The defend-
ant was under arrest when he testified before the Coro-

ner.  Judge R. B. Gautier, the County Judge for Dade county, who as coroner held the inquest, was produced as a witness by the State, and the testimony of the defendant as taken down in writing before the Coroner was read, and Judge Gautier was asked whether or not the defendant made that statement at that time. The arttoney for the defendant objected to the question upon the grounds: That the stenographer was the only proper person by whom to prove the record; because the witness does not attempt to testify from his memory, and because the statement was made by the defendant after he was arrested, and that it was the duty of the Magistrate to warn the defendant and advise him of his rights. The court overruled the objection, and the witness replied that he could not testify from his memory that the defendant made the statement, but that he "read this record just as it has been read." The State then produced Carl Hulmer, who reduced to writing the testimony of the defendant at the inquest. The document was then read to the witness and he was asked the same question that was propounded to Judge Gautier, *viz*: "State whether or not the defendant made that statement at that time." To which question the defendant, by his Counsel, objected upon the grounds: "That the statement, if any was made by the defendant, was made after his arrest; it was made at a preliminary trial, and it was the duty of the Magistrate to warn him against making it, and they have not shown any of those necessary preliminaries." Which objection the Court overruled, the defendant excepted and the witness answered "Yes."

The objection made by the defendant's counsel was not technically accurate, nor was it very clear; but we think that it was sufficient to direct the court's attention

to the fact that the statement made by the defendant be-
fore the Coroner was made under oath, while under arrest
for killing Keene, and that the Coroner should have
warned the defendant that any statement he might make
could be used against him at the trial, and should have
advised him of his right to decline to make any state-
ment that might incriminate himself. The defendant
testified at the trial. He availed himself of the privilege
under the statute of becoming a witness in his own be-
half. As such he gave a lengthy account of the relations
between himself and Keene, and undertook to show that
on account of church differences between him and Keene
the latter had gradually become estranged from him;
that the estrangement widened, and although their fami-
lies continued the friendly relations that had existed for
many years between them, Keene's manner toward the
defendant became more and more hostile, culminating
at last in an assault upon the defendant with a deadly
weapon on the morning that Keene was killed. That
the assault occurred at Keene's house during the early
part of the morning. The defendant told of this assault,
Keene's threat to kill him, the defendant's inability to
understand this sudden violence on Keene's part; that
the defendant had been at Keene's house the afternoon
before, but not Wednesday night; that nothing unusual
had occurred in the meantime. The defendant then tes-
tified about the transaction in the field an hour or so later
that Thursday morning. He testified about getting the
B. B. shot at the store, and loading one barrel of his gun,
about shooting at a tree, a board and a hawk, getting
some watermelon seed and a rake and starting for his
field, meeting his brother-in-law, Highsmith, on the way,
asked him to come with him to plant the seed; that when

they got to the field and went to the place where he had decided to plant the seed, a place near the dviding line, the defendant saw Keene, who was going in a "rapid walk" and saying "I am here." That defendant laid down his gun as quickly as he saw Keene walking and said "My God Almighty Carlton. I don't want no trouble with you; I didn't come down for trouble—don't come here;" that Keene picked up his gun and walked two or three steps rapidly toward defendant who walked to his gun and "we both raised about the same time" and defendant fired the shot which killed Keene. The statement before the Coroner, as the document produced by the witnesses Gautier and Hulmer shows, contradicts the defendant's testimony at the trial in several material points. The statement before the Coroner shows that the defendant and his wife took supper with Keene the night before, that the trouble commenced then. It appears from that statement they were at Keene's house. That Keene and his son came by the defendant's house the next morning and invited him to come and go with them. Defendant declining, took his bicycle after eating his breakfast and rode to Fulford and on the way back went by Keene's house and took a dose of salts; that as he went in the girl was leaving for school. Then follows an account of the assault upon the defendant by Keene, which differs in many details from the defendant's testimony at the trial. As to the occurrence in the field the statement differs from the defendant's testimony in many details.

The statement was offered to impeach the testimony of the defendant. So the question is presented: Whether a statement under oath by a person under arrest before a committing magistrate or Coroner having under in-

vestigation the crime for which the person is arrested, is admissible to impeach the testimony of such person at the trial after he has testified in his own behalf, notwithstanding such statement as made would be inadmissible in evidence as part of the State's case in chief, because of the failure of the Magistrate or Coroner to warn such person and advise him of his rights? In some States this question has been answered in the affirmative, on the ground that a defendant in a criminal case who avails himself of the privilege, if it is one, of being sworn as a witness in his own behalf, waives his right of protection against compulsion to give evidence against himself and may be impeached as other witnesses. An involuntary confession. however, is inadmissible against the prisoner on the trial. It is so considered because, having been made under compulsion, it is unworthy of belief, and was obtained in violation of the prisoner's constitutional rights. May it reasonably be contended that, because the prisoner at a later time, namely, at the trial, avails himself of the privilege of becoming a witness in his own behalf, he thereby imports to his former statements a virtue that they did not possess when made? The object of the prosecution is to get before the jury the confession of the prisoner; it cannot be done before the prisoner takes the stand as a witness, because it was extorted from him, he gave it under compulsion, he was deprived of his constitutional rights, it would therefore be unfair and unjust to him, besides being considered in law unworthy of belief. May such a confession be used nevertheless for purposes of impeachment, and thereby accomplish indirectly what could not be accomplished directly? The jury would hear the confession just the same, and it would have its effect in convicting the defendant just as if it

had been admitted as part of the State's case in chief.

There is little or no difference in effect upon the jury, whether the confession is admitted as part of the State's case in chief or later during the trial, to impeach the testimony of the defendant; the jury hears it and acts upon it and the consequences to the defendant are the same, his legal rights as a prisoner are thus violated, and his conviction unlawfully obtained. We do not approve the narrow reason which seeks to justify the admission in evidence of a confession unlawfully obtained, but hold that being inadmissible as evidence against the defendant in the one case, it is inadmissible as evidence against him in the other. His becoming a witness in his own behalf does not change its unlawful character, nor does he thereby waive his right to its exclusion. See 1 R. C. L. p. 575; Harrold v. Territory of Oklahoma, 169 Fed. Rep. 47, 17 Ann. Cas. 868; Dedge v. State, 68 Fla. 240, 67 South. Rep. 43.

Section 3979 General Statutes of Florida, 1906, provides that "In all criminal prosecutions the accused may at his option be sworn as a witness in his own behalf and shall in such case be subject to examination as other witnesses; but no accused person shall be compelled to give testimony against himself, nor shall any prosecuting attorney be permitted before the jury or court to comment on the failure of the accused to testify in his own behalf, and a defendant offering no testimony shall be entitled to the concluding argument before the jury."

In the case of Maloy v. State, 52 Fla. 101, 41 South. Rep. 791, this court said that: "A defendant taking the stand as a witness may as a witness be impeached as any other witness." But the court did not mean by that language to convey the idea that an accused person by

testifying in his own behalf thereby rendered his testimony liable to impeachment by every unlawful confession induced by promises, or wrung from him by so-called "third degree" methods, secret inquisitions or brutal torture. If it was permissible, the very guarantee of the statute, *viz*: "but no accused person shall be compelled to give testimony against himself," would be violated and the privilege afforded by the statute be thus converted into a means to effect the unlawful conviction of the defendant. "The defendant by becoming a witness in his own behalf merely puts himself on the same footing as other witnesses." He is not required to surrender any right for the privilege; nor does he thereby render lawful that which was unlawful. See Clinton v. State, 53 Fla. 98, 43 South. Rep. 312.

That the statements made by the defendant before the Coroner were inadmissible in evidence against him, because he was under arrest for the alleged crime at the time, and was sworn as a witness to testify before the Coroner, who did not advise the defendant of his rights, nor warn him that his statements could be used against him on the trial, is sustained by many decisions of this court. Daniels v. State, 57 Fla. 1, 48 South. Rep. 747; Jenkins v. State, 35 Fla. 737, 18 South. Rep. 182; Green v. State, 40 Fla. 474, 24 South. Rep. 537; Howell v. State, 66 Fla. 210, 63 South. Rep. 421.

During the trial of this case, Martha Keene, a daughter of the deceased, was called by the State as a witness in chief. She testified that Monday morning prior to the day on which her father was killed, the defendant came to Keene's house, went into a bed room which the girl was cleaning, and made improper proposals to her, catching her by the arms and holding her while

she struggled and cried out to him to release her; that she told her father Wednesday night following this incident, that the defendant had been there Monday morning, what he had done, and of his improper language, and that she waited until Wednesday to tell her father because she "knew it would not do to wait any longer," and that she knew "it would cause trouble." There was no objection by the defendant to this testimony, and the cross-examination brought out more fully the details of the defendant's alleged improper proposals to and assaults upon the girl. On redirect examination the girl amplified her statements very much as to the alleged assault that the defendant made upon her in the house that Monday morning, saying that in order to prevent the defendant from doing "what he wanted to" she "laid down, sat down on the floor and held my clothes down the best I could." At the conclusion of the trial the defendant moved the court to strike "all of the testimony of the witness Martha Keene relative to any improper conduct on the part of the defendant Crawford toward her, and all of the testimony in relation to any communication which she might have made to her father with regard to this conduct, and all of the testimony of the whole case, whether offered by the defendant or offered by the State relative to any effort on the part of the defendant with regard to improper conduct or relations with witness Martha Keene." The reasons or grounds assigned were that such evidence was irrelevant, and that the story Martha Keene told her father was not told in the defendant's presence. This motion was denied, and such ruling of the court is asigned as the sixth error.

When Martha Keene was called as a witness, her testimony certainly at that stage of the case was improper,

22

in that it was irrelevant, and highly prejudicial to 'the defendant, and the court should have sustained any objection to it properly made; but no objection was made by the defendant. The witness testified in direct examination, was cross-examined, and examined again upon re-direct, without any objection from the defendant. When the testimony was concluded both on behalf of the State and the defendant, the motion to strike the testimony of Martha Keene was made. In view of all the evidence in the case, then, was it inadmissible for any purpose? Lewis v. State, 55 Fla. 54, 45 South. Rep. 998; Sims v. State, 59 Fla. 38, 52 South. Rep. 198.

The defendant's defense was justification by self defense. He had testified that early Thursday morning the deceased had made an assault upon him with a deadly weapon, and in the field later that day advanced upon defendant in a threatening manner with a deadly weapon which deceased had carried to the field with him. Martha Keene's testimony as to the defendant's assault upon her, which information she had communicated to her father, afforded a motive or reason, however unjustifiable in law, for the assault which defendant said the deceased made on him in the field; thus tending to support the defendant's defense; it also tended to contradict the testimony of the defendant as to the reason for the assault made by the deceased, being a church controversy or religious disputation. No illicit relations were shown to exist between the defendant and the daughter of the deceased; on the other hand, Martha Keene's testimony showed conclusively that no such relations existed; her testimony therefore was not admissible on the authority of the Johnson case, 24 Fla. 162, 4 South. Rep. 535, but the evidence did furnish a motive for, and explanation of

the assault made by the deceased upon the defendant at the former's house, and tended to contradict the testimony of the defendant as to the pleasant relations which he undertook to show existed between him and the deceased. The motion to strike the testimony, therefore, was properly overruled.

Jim Key was one of the jurors who tried the case. The verdict was signed by "J. M. Key, Foreman." The receipt of this verdict is assigned as the seventh and eighth errors. There is no contention that J. M. Key who signed the verdict as Foreman was not the same individual who as one of the jury and whose name appeared among the list as "Jim Key" sat upon the case.

The fact that the juror who signed the written verdict with his initials instead of an abbreviation of his first name as it appears in the list, does not vitiate the verdict. If the verdict had been delivered orally by the foreman it could not have been attacked in the absence of a showing that he was not the individual who was selected as one of the jury to try the case. These assignments are not sustained. Malony v. Harkey, Ga. Dec. Pt. 2, 159. See also Commonwealth of Pennsylvania v. Potts, 47 L. R. A. (N. S.) 714, note; Brewer v. State, 53 Fla. 1, 43 South. Rep. 423, 12 Ann. Cas. 79.

As the case will have to go back for another trial, we will not consider the ninth assignment of error which attacks the sufficiency of the evidence to support the verdict.

The tenth assignment of error attacks the entire general charge of the court; it will therefore not be considered except so far as is necessary to ascertain if any one of the several instructions was properly given. Peeler v. State, 64 Fla. 385, 59 South. Rep. 899. The same rule applies to the eleventh assignment which groups in

one assignment the court's refusal to give nine charges requested by the defendant. Davis v. State, 66 Fla. 349, 63 South. Rep. 847.

The general charge of the court was full, clear and impartially stated the law applicable to the case. The refusal to give charges number five and seven, which the defendant requested, were correctly refused, because fully covered by the court in its general charge. In the general charge the court's instructions on the burden of proof and the law of self defense were full and clear, and all that the defendant might reasonably ask. These assignments are not sustained.

For the errors pointed out, the judgment of the court is reversed and a new trial ordered, costs to be assessed against Dade county.

TAYLOR, C. J., and SHACKLEFORD, COCKRELL, and WHITFIELD, JJ., concur.